UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARCEL SHILO,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>DITECH FINANCIAL LLC et al.,<br><br>　　　　Defendant. | Civil Action No. 16-11564 |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                           July 26, 2017

### I.  Introduction

Plaintiff Marcel Shilo ("Shilo") has filed this lawsuit against Defendants Ditech Financial LLC ("Ditech") and the Federal National Mortgage Association ("Fannie Mae") (collectively, "Defendants") alleging a breach of contract and breach of the implied covenant of good faith and fair dealing (Count I), lack of the statutory power of sale (Count II), lack of standing to foreclose upon his property (Count III), failure to send a pre-foreclosure certification in compliance with 209 C.M.R. § 18.21A(2)(c) (Count IV), violation of the Truth in Lending Act (Counts V and VI) and seeks quiet title to the property (Count VII).  D. 18.  Defendants have now filed an amended motion for judgment on the pleadings.  D. 42.[1]  For the reasons stated below, the Court ALLOWS the motion.

---

[1] In light of the filing of this amended motion, the original motion, D. 41, is DENIED as moot.

## II. Standard of Review

Rule 12(c) allows a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed-but early enough not to delay trial." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), however, is "ordinarily accorded much the same treatment" as a Rule 12(b)(6) motion. Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54 (1st Cir. 2006). To survive a motion for judgment on the pleadings, therefore, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Because a motion for judgment on the pleadings "calls for an assessment of the merits of the case at an embryonic stage," Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (internal citation omitted), the Court "view[s] the facts contained in the pleadings in the light most favorable to the nonmovant and draw[s] all reasonable inferences therefrom" in its favor. Id. (internal citation and quotation mark omitted). On a Rule 12(c) motion, however, the Court considers the pleadings as a whole, including the answer. See Aponte-Torres, 445 F.3d at 54-55. Those assertions in the answer that have not been denied and do not conflict with the assertions in the complaint are taken as true. See Santiago v. Bloise, 741 F. Supp. 2d 357, 360 (D. Mass. 2010). In addition, "[t]he court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice." R.G. Fin. Corp. v. Vergara-Nuñez, 446 F.3d 178, 182 (1st Cir. 2006).

## III. Factual Background

The property in question is located at 97 Bishop Drive, Unit 97, Framingham, MA 01702 (the "Property"). D. 18 ¶ 9. On February 13, 2006, Shilo executed a promissory note in the amount of $192,000 (the "Note") to Mortgage Lenders Network ("MLN") and executed a mortgage granting Mortgage Electronic Registration Systems ("MERS"), as nominee for MLN, a security

interest in the Property. Id. ¶ 10. MLN filed for Chapter 11 bankruptcy in the District of Delaware in 2007 and, by 2009, it had ceased all business operations pursuant to a Chapter 11 bankruptcy liquidation plan. Id. ¶¶ 15, 16.

The servicing on the loan has been transferred numerous times including transfers from MLN to Countrywide, from Countrywide to Bank of America and ultimately from Bank of America to Green Tree Servicing LLC ("Green Tree"), which began servicing the loan by November 1, 2011. Id. ¶ 13. On April 9, 2012, MERS transferred the mortgage to Green Tree, as well. Id. ¶ 14.

In 2012, Shilo defaulted on his loan and entered into a loan modification agreement with Green Tree, whereby Green Tree agreed to modify the loan permanently. Id. ¶ 19. On September 29, 2014, Shilo received a separate Modification Trial Period Plan Notice (the "TPP") from Green Tree via postal mail. Id. ¶ 22. The top of the letterhead read, "Mortgage Modification Offer— YOU'RE APPROVED!" D. 49-1 at 1 (capitalizations in original). The TPP further stated that to enter into the Mortgage Modification Trial Period Plan, Shilo would have to "Step 1: Send your first Trial Period Plan monthly payment of $825.77 by 09/26/2014 and continue to make that payment each month during the trial . . . [and] Step 2: To see if you are eligible for the lowest possible interest rate . . . [c]omplete the enclosed Borrower Response Package and submit by 11/02/2014." Id. Additionally, the TPP outlined the requirements for entering into a permanent modification. D. 42-3 at 11. The letter explained that Shilo would need to make three payments of $825.77 during the three-month trial plan and that upon successful completion of making those payments he would need to submit "two signed copies of [the] modification agreement." Id. at 10-11. Once Green Tree also signed the copies of the modified agreement, Shilo's mortgage would then be "permanently modified in accordance with the terms of [the] modification agreement." Id.

at 11.  The "Frequently Asked Questions" section of the letter contained the question, "When will I know if my account can be modified permanently and how will the modified account balance be determined?"  Id. at 12.  The answer explained that "[a]s long as you have met all of the applicable qualification requirements, once you make all of your trial period payments on time and returned to us two copies of a modification agreement with your signature, we will sign one copy and send it back to you so that you will have a fully executed modification agreement detailing the terms of the modified account."  Id.

Shilo made the three required TPP payments and continued making payments for $825.77 for the subsequent sixteen months.  D. 18 ¶ 24.  In a letter dated May 27, 2015, Green Tree informed Shilo that his loan was in default and that he had a right to cure.  Id. ¶ 53.  It also noted that failure to cure the default could result in foreclosure of the Property.  Id.; D. 42-4 at 3.

On August 31, 2015, Ditech Mortgage Corp. and DT Holdings LLC merged with and into Green Tree and Green Tree changed its name to Ditech Financial LLC ("Ditech").  D. 18 ¶ 74  Due to this merger, the servicing of Shilo's loan was transferred from Green Tree to Ditech that same day.[2]  Id.  In September 2015, Defendants failed to send Shilo's monthly mortgage statement.  D. 18 ¶ 32.

On July 5, 2016, Ditech sent Shilo a Notice of Foreclosure (the "Notice") pursuant to Mass. Gen. L. c. 244, § 14; D. 18 ¶ 33.  Enclosed in the Notice was a "Certification Pursuant to Massachusetts 209 C.M.R. 18.21A(2)" which stated that Ditech had the right to foreclose because

---

[2] Because the merger and name change of Green Tree and Ditech do not appear to be disputed, the Court takes judicial notice of the merger.  See Rice v. Wells Fargo Bank, N.A., 2 F. Supp. 3d 25, 38 n. 7 (D. Mass. 2014).

it was "the holder of the mortgage and the authorized agent of the owner of the Note, which is Federal National Mortgage Association." D. 18 ¶ 65; D. 42-6 at 6.

## IV. Procedural History

Shilo instituted this action on July 25, 2016, in Middlesex Superior Court, D. 1-3, and on July 29, 2016, Defendants removed the case to this Court, D. 1. On November 16, 2016, the Court denied an emergency motion for preliminary injunction to prevent the foreclosure sale of the Property. D. 34. Defendants have now filed a motion for judgment on the pleadings as to all claims. D. 42. The Court heard the parties on the pending motion and took the matter under advisement. D. 57.

## V. Discussion

### A. Shilo's Breach of Contract Claim Fails Because No Valid Contract Existed (Count I)

Under Count I, Shilo has brought both a breach of contract claim and a claim of breach of the implied covenant of good faith and fair dealing resulting from Defendants' alleged failure to abide by the terms of the loan modification agreement. D. 18 ¶¶ 39-41, 47. While Shilo's amended complaint is not clear as to the precise nature of the agreement that allegedly constitutes the "loan modification agreement," the Court presumes his claim is premised on a breach of the TPP. A plaintiff alleging a breach of contract claim must show (1) that the parties entered into a valid contract; (2) the plaintiff performed or was ready to perform his obligations under the contract; (3) the defendant breached the contract; and (4) the plaintiff sustained damages as a result of the breach. See Linton v. N.Y. Life Ins. & Annuity Corp., 392 F. Supp. 2d 39, 41 (D. Mass. 2005). Courts in this district have recognized that "[t]rial period plans and trial plan agreements ("TPAs") have all the trappings of binding contracts." Traut v. Quantum Servicing Corp., No. 15-cv-13401-NMG, 2016 U.S. Dist. LEXIS 104180, at *7 (D. Mass. Aug. 4, 2016).

5

The TPP was enforceable, but did not constitute a permanent loan modification. A party makes an offer when it manifests a "willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Bourque v. FDIC, 42 F.3d 704, 708 (1st Cir. 1994) (quoting Restatement (Second) of Contracts § 24, at 71 (1981)) (internal quotation mark omitted). Here, the TPP denotes the terms and duties that each party must perform and alerts the parties that "time is of the essence" for performance under the terms of the offer. D. 42-3 at 10-11. Moreover, the TPP provides a detailed description of the dates and manner by which the borrower submits monthly payments and the TPP indicates that Shilo can demonstrate acceptance of the offer by sending his first trial period payment by the indicated date. Id. Shilo argues that because he timely made each of the trial payments—an allegation that Defendants do not dispute—a valid loan modification contract was formed. D. 49 at 9.

But Shilo's acceptance of the TPP offer did not constitute a permanent loan modification. The TPP and the permanent loan modification are two separate and distinct agreements, as the language of the TPP makes clear. D. 42-3 at 11. Indeed, the TPP states, "[o]nce you have successfully made each of the [trial period] payments above by their due dates, you have submitted two signed copies of your modification agreement, you have met all of the applicable qualification requirements, and we have signed the modification agreement, your mortgage will be permanently modified." Id. Thus, while Shilo may have entered into an enforceable contract as to the TPP, there is no allegation in the complaint that he subsequently submitted two copies of a modification agreement to Ditech, that Ditech signed a modification agreement or that Ditech failed to send Shilo a permanent modification agreement after he completed the trial period. In other words, while the signing of the TPP and completion of the trial period program were conditions precedent

to a permanent modification of Shilo's mortgage, they did not in and of themselves mark acceptance of an alleged permanent modification offer. As such, no valid permanent modification contract exists and without a contract there can be no breach. Similarly, without an enforceable contract for a permanent loan modification, Shilo's claim for breach of the implied covenant of good faith and fair dealing also fails as a matter of law. See Ciccone v. City of Newton Police Dep't, No. 054456A, 2009 WL 4282087, at *1 (Mass. Super. Ct. Nov. 5, 2009) (explaining that "[t]here cannot be a breach of the covenant of good faith and fair dealing where there was no contract of which the implied covenant could be a part").[3] The Court, therefore, GRANTS Defendants' motion for judgment on the pleadings as to Count I.

> **B.** **Shilo's Claim Against Defendants for Failure to Comply with Paragraph 22 of the Mortgage Must be Dismissed (Count II)**

Shilo next alleges that Defendants failed to comply with Paragraph 22 of the Mortgage and, consequently, that they lack the statutory power of sale necessary to foreclose upon the Property. D. 18 ¶¶ 48-55. In Massachusetts, a foreclosure by power of sale requires that a foreclosing bank must "comply[] with the terms of the mortgage . . . ." Mass. Gen. L. c. 183, § 21. If a bank fails to comply with the power of sale and the terms of the mortgage, then a

---

[3] Additionally, it appears that Shilo's breach of contract claim is barred by the statute of frauds. Mass. Gen. L. c. 259, § 1, states: "No action shall be brought: . . . Upon a contract for the sale of lands, tenements or hereditaments or of any interest in or concerning them; . . . Unless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized." Because "a contract affecting a mortgage falls squarely within the Statute," French v. Chase Bank, N.A., No. 10-cv-11330-RGS, 2012 WL 273724, at *2 (D. Mass. Jan. 31, 2012), any promise "concerning a mortgage, including a modification of the loan terms, must be in writing." Saade v. Pennymac Loan Servs., LLC, No. 15-cv-12275-IT, 2016 WL 6089684, at *2 (D. Mass. Oct. 17, 2016). Here, no such writing agreeing to modify permanently Shilo's loan appears to exist, nor has the existence of any such document been alleged in Shilo's amended complaint.

foreclosure may be void. U.S. Bank Nat'l Ass'n v. Schumacher, 467 Mass. 421, 428 (2014). Paragraph 22 of the Shilo's mortgage contract states:

> 22. Acceleration; Remedies. Lender shall give notice to the Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to the Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by the Security Instrument and the sale of the Property. The notice shall further informer Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.

D. 31-2 at 14. According to Shilo, the default notice sent by Ditech does not meet the minimum requirements of Paragraph 22 because it does not inform him of his right to bring a court action to assert the nonexistence of a default and does not accurately reflect the true balance and payments due on the mortgage loan. D. 18 ¶ 53.

In Pinti v. Emigrant Mortgage Co., Inc., 472 Mass. 226, 227, 243 (2015), the Supreme Judicial Court held that "strict compliance with the notice of default provisions in paragraph 22 of the mortgage [i]s required as a condition of a valid foreclosure sale" and that the "failure to strictly comply render[s] the sale void." Id. But that court also "conclude[d] that in this case, because of the possible impact that our decision may have on the validity of titles, it is appropriate to give our decision prospective effect only: it will apply to mortgage foreclosure sales of properties that are the subject of a mortgage containing paragraph 22 or its equivalent and for which the notice of default required by paragraph 22 is sent after the date of this opinion." Id. at 243. Here, the notice of default in this case was sent on May 27, 2015, prior to Pinti being decided on July 17, 2015, see D. 18 ¶ 53, and Pinti does not apply retroactively. See HMC Assets, LLC v. Conley, No. 14-cv-10321-MBB, 2016 WL 4443152, at *21 (D. Mass. Aug. 22, 2016) (noting that where notice of

8

default pre-dated the Pinti decision and case was not on appeal at the time that Pinti was decided, the Pinti rule did not apply); Buba v. Deutsche Bank Nat'l Trust Co. Americas, No. 16-cv-10421-PBS, 2016 WL 2626861, at *5 (D. Mass. May 6, 2016) (same).[4]  Consequently, Defendants' motion for judgment on the pleadings is GRANTED as to Count II.

> **C. Ditech was the Holder of the Mortgage by Virtue of an Assignment from MERS (Count III)**

Shilo next claims that the Mortgage was not assigned properly to Ditech by MERS and, as a result, Ditech lacked the standing to foreclose on the Property.  D. 18 ¶¶ 56-64.  As alleged, MLN terminated its nominee relationship with MERS in 2009 when MLN declared bankruptcy.  Id.  Because the alleged assignment of the Mortgage to Green Tree did not occur until 2012—three years after MLN declared bankruptcy—Shilo argues that the exercise of the statutory power of sale and foreclosure by Ditech is wrongful, without legal effect and necessarily void.  D. 49 at 2-3, 11.  Defendants counter that Ditech is the holder of the Mortgage and, therefore, that Ditech had standing to foreclose on the Property.  D. 42 at 9.

"[I]n Massachusetts an entity that holds a mortgage but not the associated promissory note holds that mortgage in an equitable trust for the benefit of the noteholder."  Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 355 (1st Cir. 2013) (citing U.S. Bank Nat'l Ass'n v. Ibanez, 458 Mass. 637, 652 (2011).  The First Circuit has explained that "MERS's status as an equitable trustee does not circumscribe the transferability of its legal interest."  Id.  In other words, MERS may assign

---

[4] The Court is aware of where a district court applied the Pinti strict compliance requirement to a case in which the default notice was sent prior to Pinti being decided.  Paiva v. Bank of N.Y. Mellon, 120 F. Supp. 3d 7, 10 (D. Mass. 2015).  In doing so, however, the Court noted that "the cross-motions for summary judgment were fully briefed before Pinti was issued on July 17, 2015," and, because the Plaintiff "was already advancing the same argument regarding strict compliance with the paragraph 22 requirements that the SJC adopted in Pinti, it would be inequitable to deny him the benefit of that decision."  Id.  Such is certainly not the case here where Shilo did not assert his claim until a year after Pinti was decided.

mortgages held in its name. This is true regardless of the dissolution of the original lender. Courts have consistently held that bankruptcy and dissolution does "not prevent its successors and assigns . . . from seeking transfer of the mortgage from MERS." Kiah v. Aurora Loan Servs., LLC, No. 10-cv-40161-FDS, 2011 WL 841282, at *4 (D. Mass. Mar. 4, 2011). Indeed, in Almeida v. U.S. Bank Nat'l Ass'n, No. 12-cv-11565-RWZ, 2014 WL 907673, at *3 (D. Mass. Mar. 10, 2014), a case addressing this issue, the court explained that while "[P]laintiffs also suggest . . . that MERS, as only a nominee, lacked the authority to assign the mortgage loan to defendant. This argument is without merit. . . . That [the original lender] may have ceased all operations nine months before the assignment is of no moment." Id. "The dissolution of the original lender does not affect MERS'[s] authority to assign a mortgage." Id. (internal citation omitted). Thus, absent a contrary provision in the Mortgage, "a mortgagee 'may assign its mortgage to another party,' and 'need not possess any scintilla of a beneficial interest in order to hold [and assign] the mortgage.'" Mills v. U.S. Bank, NA, 753 F.3d 47, 51 (1st Cir. 2014) (quoting Culhane v. Aurora Loan Servs. of Neb., 708 F.3d 282, 292-93 (1st Cir. 2013)).

Furthermore, MERS does not need authorization from the noteholder to assign the mortgage. That is, "despite [the note-holder's right] . . . to demand and obtain an assignment of the mortgage in order to enforce its security interest and collect the debt, MERS (as mortgagee) retain[s] the right to assign the mortgage unilaterally absent any restriction in the mortgage document." Shea v. Fed. Nat'l Mortg. Ass'n, 87 Mass. App. Ct. 901, 903 (2015).

Here, Shilo has alleged no factual circumstances—such, for example, as the existence of a contractual provision explicitly preventing MERS from transferring the loan if the original lender went bankrupt—that would suggest that this line of settled Massachusetts law should not apply here. Indeed, in asserting this claim, Shilo ignores the plain language of the Mortgage, which

grants MERS, as nominee, the "power of sale." D. 31-2 at 4. The Court, therefore, GRANTS Defendants' motion for judgment on the pleadings as to Count III of Shilo's amended complaint.

### D. There is no Private Cause of Action under 209 C.M.R. § 18.21A(2)(c) (Count IV)

Shilo asserts a claim against Ditech for a violation of Massachusetts regulation 209 C.M.R. § 18.21A(2)(c). Section 18.21A(2) provides that, "[t]o the extent a servicer is authorized to act on behalf of a mortgagee . . . [a] third party loan servicer shall certify in writing the basis for asserting that the foreclosing party has the right to foreclose, including but not limited to, certification of the chain of title and ownership of the note and mortgage from the date of the recording of the mortgage being foreclosed upon. The third party loan servicer shall provide such certification to the borrower with the notice of foreclosure . . . and shall also include a copy of the note with all required endorsements." 209 C.M.R. § 18.21A(2). At the motion hearing, Shilo's counsel informed the Court that he would not be opposing Defendants' motion for judgment on the pleadings as to this claim. Hr'g. Tr. at 23-24. Consequently, the Court GRANTS Defendant's motion as to this claim.

### VI. Shilo's Claims Alleging Violations of the Truth in Lending Act (Counts V and VI)[5]

Shilo has also brought two claims under the Truth in Lending Act ("TILA") against Defendants. D. 18 ¶ 69-96. Count V is premised on 15 U.S.C. § 1641(g), which requires notification to mortgage borrowers when ownership of a debt is transferred and Count VI is premised on 15 U.S.C. § 1638(f) and its implementing regulation 12 C.F.R. § 1026.41(a)(2), which require servicers to provide residential mortgage borrowers a periodic statement at each billing

---

[5] In Shilo's Amended Complaint, Count VI is inadvertently referred to as Count IV, and then Count VII is labeled as Count V. D. 18. To avoid confusion, the Court refers to the claims as Counts V and VI, respectively.

cycle setting forth certain information about their loans. D. 42 at 14; D. 49 at 13-14. Neither Fannie Mae nor Ditech may be found liable for either alleged violation.

    A.    <u>Fannie Mae</u>

TILA provides for civil liability against creditors in § 1640(a), which provides a private right of action for damages against "any creditor who fails to comply with any requirement imposed under [TILA]." 15 U.S.C. § 1640(a). The term "creditor" is defined by TILA to refer only to a person who both:

> (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

<u>Vincent v. The Money Store</u>, 736 F.3d 88, 105 (2d Cir. 2013) (quoting 15 U.S.C. § 1602(g)). "This definition 'is restrictive and precise, referring only to a person who satisfies both requirements' of the provision." <u>Id.</u> (quoting <u>Cetto v. LaSalle Bank Nat'l Ass'n</u>, 518 F.3d 263, 270 (4th Cir. 2008)).

Fannie Mae is not the entity to whom the debt arising from the consumer credit transaction was initially payable and, as such, Fannie Mae does not satisfy the "creditor" definition as outlined under TILA. <u>See, e.g.</u>, <u>id.</u> at 106 (ruling defendant-assignee was not a creditor under TILA because it was not the initial lender on the loans); <u>Faiella v. Green Tree Servicing LLC</u>, No. 16-cv-088-JD, 2017 WL 589096, at *3-4 (D.N.H. Feb. 14, 2017) (concluding Fannie Mae was "not a creditor under TILA because it [was] not the entity to whom [the plaintiff's] note was originally payable").

While TILA also provides for civil liability against specified assignees of the original creditor, Fannie Mae cannot be held liable under that provision either. 15 U.S.C. § 1641(a) provides that a civil action for a TILA violation "may be maintained against any assignee of such creditor only if the violation for which such action or proceeding is brought is apparent on the face

of the disclosure statement, except where the assignment was involuntary." 15 U.S.C. § 1641(a). This includes consumer credit transactions secured by real property. See id. § 1641(e)(1). A violation is apparent on the face of the disclosure statement if "the disclosure can be determined to be incomplete or inaccurate by a comparison among the disclosure statement, any itemization of the amount financed, the note, or any other disclosure of disbursement" or "the disclosure statement does not use the terms or format required to be used by [TILA]." Id. § 1641(e)(2).

Fannie Mae contends that the term "disclosure statements" as mentioned in 15 U.S.C. § 1641(e)(2) refers only to "those documents generated in connection with the origination of the loan." D. 42 at 16 (citation and internal quotation marks omitted). That is, "Shilo's TILA claim is not based on any disclosure statements issued to him" but on "Ditech's alleged failure to provide a complete periodic statement after delinquency and notice of a transfer of the Mortgage." Id. at 17. Fannie Mae, therefore, asserts that it cannot be liable as an assignee as the alleged TILA violation occurred after the assignment of the loan to Fannie Mae and was not apparent on the face of the disclosure statement. Id. Shilo does not respond to this argument. D. 49 at 13-14.

The Court agrees with Fannie Mae. TILA generally "requires disclosure of certain terms and conditions of credit before consummation of a consumer credit transaction." Hauk v. JP Morgan Chase Bank USA, 552 F.3d 1114, 1120 (9th Cir. 2009) (citing Rendler v. Corus Bank, 272 F.3d 992, 996 (7th Cir. 2001)) (internal quotations omitted). As other courts have ruled, the term "disclosure statement" is used in TILA "to refer to documents provided before the extension of credit," in other words, "at or before closing." Evanto v. Fed. Nat'l Mortg. Ass'n, 814 F.3d 1295, 1298 (11th Cir. 2016); Signori v. Fed. Nat'l Mortg. Ass'n, 934 F. Supp. 2d 1364, 1368 (S.D. Fla. 2013) (stating that disclosure documents are "documents generated in connection with the

13

origination of the loan"). Thus, violations based on events occurring after an extension of credit cannot serve as a basis for assignee liability under TILA.

Moreover, Section 1638(a) lists the disclosures a creditor must make with respect to consumer credit transactions. See 15 U.S.C. § 1638(a). Disclosures required under § 1638(a) are referred to in other parts of § 1638 as "disclosure statement[s]." See id. § 1638(b)(2)(D). The fact that the periodic statement requirement is not part of § 1638(a) demonstrates that Congress did not intend for periodic statements to be considered "disclosure statements" under TILA. This inference is supported by the language of § 1638(f), which lists the information that will be conveyed to the residential mortgage borrower and does not use the words "disclose" or "disclosure." Id. § 1638(f). Rather, it provides that periodic statements setting forth information shall be conveyed to the borrower. Id.

Nor can Shilo rely upon Section 1641(e). Section 1641(e) provides that a violation on the face of a disclosure statement is apparent if it can be identified by comparison to "any itemization of the amount financed, the note, or any other disclosure of disbursement," all of which are documents or disclosures concerning a loan's closing. Id. § 1641(e)(2). Given that Shilo failed to respond to Defendants' arguments here, there is no explanation as to how any of these documents could provide a basis for concluding that Fannie Mae is liable as an assignee for an alleged TILA violation that occurred after the loan's closing and assignment and was not apparent on the face of the disclosure statement. The Court cannot view the periodic statements required under TILA as disclosure statements. Accordingly, Shilo has failed to plead a violation for which Fannie Mae as an assignee may be liable under TILA. See Akar v. Fed. Nat'l Mortg. Ass'n, 845 F. Supp. 2d 381, 393-94 (D. Mass. 2012) (concluding that plaintiff failed to allege sufficient facts to support finding

assignee liable under TILA); Cheche v. Wittstat Title & Escrow Co., LLC, 723 F. Supp. 2d 851, 856 (E.D. Va. 2010) (same).

Finally, to the extent that Shilo relies upon vicarious liability as an alternative means of holding Fannie Mae liable, D. 49 at 14, that argument fails. Even assuming that TILA provides for vicarious liability, Shilo can only pursue that theory of liability if he has a private right of action to bring suit. See Faiella, 2017 WL 589096, at *3-4 (citing James v. Nationstar Mortg., LLC, 92 F. Supp. 3d 1190, 1198 (S.D. Ala. 2015) (rejecting vicarious liability for assignee because TILA "does not create or allow a cause of action for damages against assignees"). As discussed above, TILA precludes a private right of action against assignees in the circumstances alleged here.

B. Ditech

Ditech argues that it cannot be liable under TILA for a failure to provide a periodic statement to Shilo pursuant to Regulation Z because it is a servicer. D. 42 at 14-15. Shilo does not respond to this argument. D. 49 at 13-14.

As noted above, TILA provides civil liability under § 1640(a) only as to "creditor[s]" and certain assignees. 15 U.S.C. §§ 1640(a), 1641(e). "While a servicer of a loan has the obligation to provide certain information to borrowers under the Act, 'liability for violations of TILA rests squarely and solely with creditors.'" Jones v. Bank of N.Y., No. 12-cv-11503-RWZ, 2013 WL 3728382, at *5 (D. Mass. July 12, 2013) (citing Shaw v. BAC Home Loans Servicing, LP, No. 10-cv-11021-DJC, 2013 WL 789195, at *7 (D. Mass. Mar. 1, 2013)); see Schneider v. Bank of Am. N.A., No. S-11-cv-2953 LKK, 2014 WL 2118327, at *5 (E.D. Cal. May 21, 2014) (stating TILA "provides for civil liability only against the creditor and its assignee"). A servicer may not "be treated as an assignee for purposes of liability under TILA 'on the basis of an assignment of [an] obligation from the creditor or another assignee to the servicer solely for the administrative

15

convenience of the servicer in servicing the obligation.'" Horton v. Country Mortg. Servs., Inc., No. 07-cv-6530, 2010 WL 55902, at *3 (N.D. Ill. Jan. 4, 2010) (citing 15 U.S.C. § 1641(f)(2)). As Ditech is a servicer, and not a creditor or assignee, Shilo has failed to plead a violation for which Ditech may be liable under TILA.

Accordingly, the Court ALLOWS Defendants' motion for judgment on the pleadings as to Counts V and VI.

## VII. Quiet Title Claim (Count VII)

Finally, Shilo asserts a quiet title claim against Ditech on the basis that the foreclosure sale is void. D. 18 at 25-26. Mass. Gen. L. c. 240, § 6 authorizes actions "to quiet or establish the title to land situated in the commonwealth or to remove a cloud from the title thereto." Mass. Gen. L. c. 240, § 6. However, under Massachusetts law, to maintain a quiet title action, a plaintiff must have both actual possession of and legal title to the property. Ayer v. U.S. Bank, N.A., No. 12-cv-10981-NMG, 2012 WL 5361480, at *2 (D. Mass. Oct. 30, 2012) (citing Daley v. Daley, 300 Mass. 17, 21 (1938)). In a title theory state like Massachusetts, a mortgagee holds legal title and the mortgagor retains only equitable title until the loan debt is fully repaid. Ayer, 2012 WL 5361480, at *2; Ibanez, 458 Mass. at 649. "Thus, a quiet title action is not an avenue open to a mortgagor whose debt is in arrears because, until the mortgage is discharged, the title necessarily remains under a cloud." Oum v. Wells Fargo, N.A., 842 F. Supp. 2d 407, 412 (D. Mass. 2012), *abrogated on different grounds by* Culhane 708 F.3d at 290. Because Shilo does not allege to have paid his loan in full, Defendants are entitled to a favorable ruling on their motion for judgment on the pleadings, which the Court now GRANTS.

## VIII. Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion for judgment on the pleadings, D. 42.

**So Ordered.**

                                                  /s/ Denise J. Casper
                                                  United States District Judge